UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **DAWN SIMMONS, ET AL.** | **CASE NO. 6:23-CV-00058 LEAD** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **GEICO INSURANCE CO., ET AL.** | **MAGISTRATE JUDGE DAVID J. AYO** |

<u>RULING</u>

The present matters before the Court are three motions for summary judgment: (1) a Motion for Partial Summary Judgment on the Issue of Insurance Coverage filed by Plaintiffs, Ray and Dawn Simmons, and Bernard and Bethany Darby [ECF No. 41]; (2) a Motion for Partial Summary Judgment as to the Commercial Multi-Peril Insurance Policy ("CGL policy") filed by Defendant, Brotherhood Mutual Insurance Co. ("Brotherhood") [ECF No. 45]; and (3) a Motion for Partial Summary Judgment Pursuant to La. R.S. 22:1295(1)(c) filed by Brotherhood [ECF No. 43]. The Court has reviewed the parties' briefs, the summary judgment record, and the relevant authorities. For the reasons that follow, Brotherhood's Motion for Partial Summary Judgment as to the CGL Policy is GRANTED, Plaintiffs' Motion for Partial Summary Judgment on the Issue of Insurance Coverage is DENIED, and Brotherhood's Motion for Partial Summary Judgment Pursuant to La. R.S. 22:1295(1)(c) is DENIED as moot.

## I.
### BACKGROUND

This insurance coverage dispute arises out of a tragic automobile collision on December 17, 2021, that claimed the lives of three of the Simmons' family's children. On that date, Dawn Simmons and three of her children—Lindy, Christopher, and Kamryn Simmons—as well as

Christopher's girlfriend, Marisa Darby, were traveling together in the Simmons' family car.[1] Christopher Simmons was a student at Acadiana Christian School ("ACS") in New Iberia, Louisiana and was a member of the ACS basketball team. Marissa and the Simmons family were traveling back to their home in Iberia Parish from a basketball game in Monroe, Louisiana.[2] At the time of the collision, Lindy, who was a 20-year-old student at Nicholls State University, was driving the Simmons' family car.[3] The group was traveling southbound on I-49 when they were struck head-on by a vehicle driven by John Lundy, who was traveling in the wrong direction on I-49. It was later determined that Lundy had a blood alcohol level that exceeded the legal limit.[4] Lindy, Kamryn, and Christopher died in the accident; Dawn and Marisa were severely injured.[5]

Ray and Dawn Simmons subsequently filed suit in the 27th Judicial District Court, St. Landry Parish, asserting wrongful death and personal injury claims, and naming as defendants Lundy's estate, GEICO Insurance Company (Lundy's automobile liability insurer), Allstate Property and Casualty Insurance Company (the Simmons' underinsured/uninsured motorist insurer), and Brotherhood Mutual Insurance Company (ACS's CGL and Commercial Business Auto insurer).[6] Bernard and Bethanie Darby (the parents of Marissa) also filed suit against the same defendants in the 27th Judicial District Court. Both suits were removed to this Court and were thereafter consolidated.[7] The Court previously granted partial summary judgment in Brotherhood's favor, finding no coverage was available to Plaintiffs under the Commercial Business Auto Policy Brotherhood issued to ACS.[8] By the present motion, Brotherhood seeks a

---

[1] ECF No. 41 at 2.
[2] *Id.*
[3] ECF No. 41-2 at 1; ECF No. 45-1 at 2.
[4] ECF No. 41 at 1-2.
[5] *Id.*
[6] ECF No. 1-1 at 6.
[7] ECF Nos. 1, 14.
[8] ECF No. 76.

judgment finding Plaintiffs are not entitled to coverage under the Nonowned Vehicle Coverage endorsement to the CGL policy issued to ACS, and because the CGL policy was not triggered, no uninsured/underinsured coverage is available.[9] Plaintiffs, in turn, seek a declaration that they are "insureds under the nonowned auto endorsement in the Brotherhood policy and as such, are entitled to UM benefits."[10]

## II.
### SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."[11] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[13] As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[14]

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence

---

[9] ECF No. 45-3 at 25; *see also* ECF No. 43.
[10] ECF No. 41 at 7; *see also id.* at 22.
[11] FED. R. CIV. P. 56(a).
[12] *Id.*
[13] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).
[14] *Lindsey v. Sears Roebuck and Co.,* 16 F.3d 616, 618 (5th Cir. 1994) (internal citations omitted).

supporting the moving party that is uncontradicted and unimpeached."[15] "Credibility determinations are not part of the summary judgment analysis."[16] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof."[17]

## III.
## APPLICABLE LAW

Jurisdiction over this matter is premised upon diversity of citizenship, and therefore the substantive law of Louisiana applies.[18] "An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code."[19] When interpreting an insurance contract, courts are to ascertain the common intent of the parties, because "[t]he parties' intent, as reflected by the words of the policy, determine[s] the extent of coverage."[20] The words of an insurance contract are not to be read in isolation, as "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy."[21] "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may

---

[15] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party).
[16] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).
[17] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).
[18] *Erie Railroad Co. v. Topkins*, 304 U.S. 64, 78 (1938); *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 687 (5th Cir. 1991).
[19] *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003).
[20] *Reynolds v. Select Properties, Ltd.*, 634 So.2d 1180, 1183 (La. 1994); *see also Cadwallader* at 580; LA. CIV. CODE art. 2045.
[21] La. R.S. § 22:881.

be made in search of the parties' intent."[22] A provision of a contract that is susceptible to different meanings "must be interpreted with a meaning that renders it effective and not with one that renders it ineffective."[23] "Ambiguous policy provisions are generally construed against the insurer and in favor of coverage."[24] Under this rule, an equivocal provision seeking to narrow an insurer's obligation is strictly construed against the insurer.[25] However, the foregoing principle applies "only if the ambiguous policy provision is susceptible to two or more reasonable interpretations."[26] The insured bears the burden of proving an incident falls within the policy's terms, and the insurer bears the burden of proving the applicability of an exclusionary clause within the policy.[27]

## IV.
### DISCUSSION

The parties' coverage arguments center on the "Broad Form Nonowned Vehicle Coverage" endorsement to the Brotherhood CGL policy.[28] This endorsement provides that Brotherhood will "pay all sums that a **covered person** becomes legally obligated to pay as **damages** due to **bodily injury** or **property damage** to which this coverage applies."[29] Coverage applies only if "the event . . . causing the **bodily injury** . . . arise[s] out of the operation, [or] use . . . of a **nonowned vehicle** . . . by an **authorized operator**."[30] The endorsement defines "covered person" as: "**[Y]ou**; and

---

[22] LA. CIV. CODE art. 2046; *see also id.* at 2047 (a contract's words are to be given their generally prevailing meaning; words of art and technical terms are given their technical meaning if the contract involves a technical matter); *id.* at 2048 (words susceptible of different meanings are interpreted as having the meaning that best conforms to the object of the contract).
[23] LA. CIV. CODE art. 2049.
[24] *Cadwallader* at 580 (citing La. Civ. Code art. 2056).
[25] *Id.*
[26] *Id.*
[27] *Doerr v. Mobil Oil Corp.*, 2000-0947, p. 5 (La. 12/19/00), 774 So.2d 119, 124, *opinion corrected on reh'g*, 2000-0947 (La. 3/16/01), 782 So.2d 573; *see also Martco Ltd. v. Wellons, Inc.*, 588 F.3d 864, 880 (5th Cir. 2009).
[28] ECF No. 45-6.
[29] *Id.* at 2. The terms in bold font reflect defined terms. *See* ECF No. 45-4 at 23.
[30] ECF No. 45-6 at 2.

5

**your**[31] **leaders** while acting on **your** behalf and within the scope of their delegated authority. **Covered person** also includes the **authorized operator** of **your rented vehicle**, but does not include . . . any other operator of a **nonowned vehicle** who is not an **authorized operator**."[32] "Authorized operator" includes ACS's leaders and employees, as well as "[a]ny other person, but only while such person is operating or using a **nonowned vehicle** at the request of **your leader**, **your** employee, or **your appointed person**, and only if operated . . . on **your** behalf and for the benefit of **your** organization."[33] A "nonowned vehicle" is defined as "an **auto** that is not: [1] owned by you; or [2] titled solely or jointly in **your** name; or [3] leased to **you** . . . ; or [4] used as a temporary substitute for an **auto you** own that is out of service because of its breakdown, repair, servicing, loss or destruction; or [5] kept and controlled by **you**, or otherwise regularly made available for **your** benefit."[34]

Plaintiffs contend that Lindy Simmons was an "authorized operator" under this endorsement because she was operating a "nonowned vehicle" (i.e., the Simmons family car) at the request of one of ACS's leaders or employees for the benefit of ACS (i.e., transporting Christopher Simmons to Monroe to participate in an ACS sporting event). In support, Plaintiffs point to an email sent by ACS administrators to the parents of the ACS basketball players, stating:

> Good afternoon Basketball parents,
>
> We are organizing rides to the basketball game in Monroe on December 17th. We will not be taking the bus to the game. Please let me know if your child will be riding with you or if they will need a ride. If you are planning on driving, *please let me know if you could bring another basketball player.*
>
> The JV game starts at 5:30 pm and we would like JV and Varsity to be there by 4:45 pm. We will be leaving around 12:30 pm. The address to the gym is 1700 Oaklawn, Monroe, LA.

---

[31] "You" and "your" refer to ACS. *See* ECF No. 45-4 at 2, 24.
[32] ECF No. 45-6 at 1.
[33] *Id.*
[34] *Id.* at 2.

> *If you can drive another student, you will need to bring a copy of your license and insurance and get pre-approved.*
>
> Thanks,
> Admin[35]

According to Plaintiffs, this email reflects a request by ACS that parents drive the ACS basketball players to the December 17th basketball game in Monroe. They argue that Lindy fell within this request and was thus an "authorized operator" under the Nonowned Vehicle Coverage endorsement.

Plaintiffs further contend that because Lindy was an "authorized operator" and thus a "covered person" under the endorsement, she was entitled to underinured/uninsured motorist coverage under La. R. S. 22:1295. This statute reads in pertinent part:

> No automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state . . . unless coverage is provided therein or supplemental thereto, in not less than the limits of bodily injury liability provided by the policy, . . . for the protection of persons insured thereunder who are legally entitled to recover nonpunitive damages from owners or operators of uninsured or underinsured motor vehicles because of bodily injury, sickness, or disease, including death resulting therefrom; however, the coverage required under this Section is not applicable when any insured named in the policy either rejects coverage, selects lower limits, or selects economic-only coverage. . . .[36]

The coverage required by this statute is considered "an implied amendment to any automobile liability policy made 'for the protection of *persons insured thereunder*' and will be read into the policy unless validly rejected."[37]

---

[35] ECF No. 41-4 at 2 (emphasis added).
[36] La. R.S. 22:1295(1)(a)(i).
[37] *Higgins v. La Farm Bureau Cas. Ins. Co.*, 315 So.3d 838, 845 (La. 2021) (quoting La. R.S. 22:1295(1)(a)(i)).

The coverage dispute turns on whether Lindy was an "authorized operator" at the time of the collision. The summary judgment record reflects that Lindy was driving a "nonowned vehicle" at the time of the accident—the Simmons' family car was not owned by, titled in the name of, leased by, or otherwise controlled by ACS, nor was the ACS bus "out of service because of its breakdown, repair, servicing, loss or destruction."[38] The record also arguably shows that Lindy provided some benefit to ACS by transporting Christopher to and from an ACS-related athletic event. However, the endorsement also requires evidence that Lindy's "operation [or] use" of the Simmons' family car was at the "request" of ACS. Here, Plaintiffs' argument that ACS requested that Lindy drive to the game in Monroe fails for at least two reasons.

*First*, the record does not reflect any request by ACS that Lindy operate or use the Simmons' family vehicle to shuttle ACS basketball players to and from the game in Monroe. The email cited by Plaintiffs is specifically directed to "Basketball parents," not siblings or other family members. *Second*, and more importantly, the email does not reflect a broad request to all parents of basketball players to drive players to the game in Monroe; rather, the email inquired as to whether those parents who were travelling with their child to the game could provide transportation to those players who had no ride.[39] The ACS email informed parents that bus services were not going to be available to transport students to Monroe and provided the time that players needed to be in Monroe for the game. The email further inquired as to whether any team members needed a ride to the game, and whether any parents could provide transportation to team members who needed transportation. The email states that if a parent is driving "another student," the parent

---

[38] ECF No. 45-6 at 2.

[39] The endorsement does not define "request" but the dictionary definition of the term is "the act of asking for something." Merriam-Webster Third New International Dictionary, "Request" at 1929 (1986). This definition requires an affirmative action by one party asking another party for something—for example, asking the other party to perform some act.

8

would "need to bring a copy of [his or her] license and insurance *and get pre-approved*."[40] The summary judgment record includes the deposition of ACS's principal, Monique Sanchez, who testified that school administrators decided not to take ACS's bus to Monroe because all but four members of the basketball team intended to travel to Monroe with their families.[41] She testified that these families made their own, independent decisions to travel separately to the game, which was not at the request of the ACS.[42] The four members of the team without transportation ultimately travelled to Monroe with the team's coach.[43] There is no evidence in the record that Lindy or Dawn agreed to drive any other team member to Monroe, that either provided their driver's license and insurance information to ACS, or that either was "pre-approved" to drive other students. Thus, to the extent the email makes a "request," it was limited to providing transportation to students without a ride to the game. Here, there is no evidence that Lindy volunteered to drive any of the four students who did not have transportation. Considering the record as a whole, the email does not create a triable issue regarding whether ACS requested that Lindy operate or use a

---

[40] ECF No. 41-4 at 2 (emphasis added).
[41] ECF No. 45-7 at 17; *see also id.* at 14.
[42] *Id.* at 17. Specifically, Sanchez testified:
> Q: Are you aware whether there's any communication from the coaches to the players telling the players that the parents should drive to the game?
> A: No, sir.
> Q: No one's talked to you about that?
> A: Not telling the parents that we wanted them to drive to the game. For me, it was really the opposite of that.
> Q: So your understanding is the parents wanted to drive?
> A: That is correct.
> Q: So you took the bus out of service and let the parents drive. And I'm asking you, has anyone communicated anything to you different from that, that the school communicated to the players that the school wanted parents to drive?
> Q: No. The way I was approached was that parents wanted to drive their children. And I wanted to make sure that if a parent could not drive their child there—some people have to work or do other things, maybe they couldn't afford the gas—that the school's responsibility was to make sure that we provided transportation to every child that needed it.

*Id.*
[43] *Id.* at 13-14.

9

"nonowned vehicle" to transport students for the benefit of ACS. Accordingly, Lindy was not an "authorized operator" and thus not a "covered person" under the Brotherhood Nonowned Vehicle Coverage Endorsement.

Plaintiffs alternatively argue that Dawn Simmons falls within the definition of an "authorized operator" even though she was not driving the Simmons' family vehicle at the time of the collision, because Dawn was "using" the family car as a passenger. Plaintiffs note that "authorized operator" is defined in the endorsement to include someone who "is operating or using a nonowned vehicle at the request of [ACS]."[44] They argue that "use" of a vehicle is broader than operation of a vehicle, and that Dawn, as a passenger, was using the vehicle as transportation to the Monroe basketball game. The Court agrees that the term "use" in the context of this clause has a different, and perhaps broader meaning than "operate," otherwise the term "use" would be superfluous. However, even if Dawn *used* the family car as a passenger, this argument fails. As the Court concluded with respect to Lindy, the email relied upon by Plaintiffs does not make a general request to all parents to transport ACS basketball students for the benefit of ACS. At most, the request is limited to a request for volunteers to drive players who had no transportation to the game. Moreover, the request required volunteers to provide driver's license and insurance information, and required that they be pre-approved by ACS. As explained above, neither Lindy nor Dawn transported other students to the game, and they were not pre-approved by ACS after providing driver's license and insurance information.

Plaintiffs also point to an earlier text message by Christopher to Dawn that they argue reflects a request by ACS that parents drive students to the Monroe basketball game. Specifically, on December 10, 2021, Christopher texted his mother:

---

[44] ECF No. 45-6 at 1 (emphasis omitted).

10

> Christopher: They want the parents to bring us next Friday mom
> All the way to Monroe
> Or just someone to bring us there and back
> Dawn: I will take off then.[45]

This text message however is not sufficiently definite to qualify as a "request," as used in the definition of "authorized driver" in the policy endorsement. This definition requires that the request be made by "**your leader**, **your** employee, or **your appointed person** …."[46] Even if deemed a request, Chrisopher's text message does not identify who is making the request, the scope of the request, or whether the request is directed at all parents. In that regard, on December 14th, four days *after* Christopher Simmons' text, ACS sent its email regarding transportation to the game. That email did not make a broad request to transport students but, as the Court has noted, was a more limited request for volunteers to transport students who did not otherwise have transportation to the Monroe basketball game. Neither Lindy nor Dawn transported any players without a ride.

Furthermore, as argued by Brotherhood, the text is hearsay under Rule 801 of the Federal Rules of Evidence, in that it is a statement offered in evidence to prove the truth of the matter asserted in the statement. Indeed, the text is hearsay within hearsay—the text itself (first level hearsay) and the purported request that parents were to drive students (second level hearsay). Rule 805 of the Federal Rules of Evidence provides that "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Plaintiffs point to exceptions to the hearsay rule, including "present sense impression" (Rule 803(1)), "excited utterance" (Rule 803(2)), and "then-existing mental, emotional, or physical condition" (Rule 803(3)). But the record does not include the predicates for these exceptions, nor have Plaintiffs established the exceptions for both levels of hearsay. A present sense impression is

---

[45] ECF No. 41-6.
[46] ECF No. 45-6 at 1.

a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."[47] The record does not reflect whether Christopher relayed the statement reflected in his text "while or immediately after" he heard the statement. An "excited utterance" is a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement it caused."[48] Nothing in the record indicates that this statement—that parents were to provide transportation to the game—involves a "startling event," or that Christopher sent the text when he "was under the stress of excitement it caused." A statement of "then-existing mental, emotional, or physical condition" is a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed. . . ." Here, Christopher's text is not being offered to show his "motive, intent, or plan," nor is it being offered to show his "emotional, sensory, or physical condition." Rather, it is offered purportedly to show a request by ACS that parents transport basketball players to the game, and that the parents are therefore deemed "authorized operators" under the policy endorsement. Accordingly, the Court finds Christopher's text message does not fall within the Rule 803(3) exception.

In sum, the summary judgment record does not support a finding that either Lindy or Dawn was an "authorized operator" under the policy endorsement, and therefore coverage under the CGL policy is unavailable. Because neither Lindy nor Dawn are deemed an "insured" under the policy, La. R.S. 22:1295 does not provide underinsured/uninsured motorist protection based on the Brotherhood CGL Policy. Accordingly, the Court grants the Motion for Partial Summary Judgment as to the Commercial Multi-Peril ("CGL") Policy filed by Brotherhood and denies the

---

[47] FED. R. EVID. 803(1).
[48] FED. R. EVID. 803(2).

Motion for Partial Summary Judgment on the Issue of Insurance Coverage filed by Plaintiffs. Because the Court concludes that Plaintiffs are not covered under the Brotherhood policy, the Court need not address Brotherhood's alternative argument under the anti-stacking provisions of La. R.S. 22:1295(1)(c). The Court, therefore, denies Brotherhood's Motion for Partial Summary Judgment Pursuant to La. R.S. 22:1295(1)(c) as moot.

## V.
### CONCLUSION

For the reasons stated above, (1) the Motion for Partial Summary Judgment on the Issue of Insurance Coverage filed by Plaintiffs Ray Simmons, Dawn Simmons, Bethany Darby, and Bernard Darby [ECF No. 41] is DENIED; (2) the Motion for Partial Summary Judgment as to the Commercial Multi-Peril Policy filed by Brotherhood [ECF No. 45] is GRANTED; and (3) the Motion for Partial Summary Judgment Pursuant to La. R.S. 22:1295(1)(c) filed by Brotherhood [ECF No. 43] is DENIED as MOOT. The claims against Brotherhood with respect to the Brotherhood CGL Policy are DISMISSED.

THUS DONE in Chambers on this 30th day of July, 2025.

_____
ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE